Filed 2/9/24  Austin v. Superior Court CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| RUSSELL LYNWOOD AUSTIN, | |
| Petitioner, | E080939 |
| v. | (Super.Ct.No. RIF1800692) |
| THE SUPERIOR COURT OF RIVERSIDE COUNTY, | ORDER MODIFYING OPINION |
| Respondent; | [NO CHANGE IN JUDGMENT] |
| THE PEOPLE, | |
| Real Party in Interest. | |

On the Court's own motion, the opinion filed on January 25, 2024, is modified as follows:

In the second paragraph on page 27 the sentence "The senate amendment to Assem. Bill 256 provided the following language" is replaced with "The Legislative Counsel's Digest of Assembly Bill No. 256 (2021-2022 (Reg. Sess.) Summary Dig., pp. 93-94) provided the following language."

1

Except for this modification, the opinion remains unchanged.  The modification does not effect a change in the judgment.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

MILLER
Acting P. J.


I concur:


CODRINGTON
J.

Filed 1/25/24  Austin v. Superior Court CA4/2 (unmodified opinion)

*See concurring opinion.*

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

# FOURTH APPELLATE DISTRICT

# DIVISION TWO

| | |
|---|---|
| RUSSELL LYNWOOD AUSTIN, | |
| Petitioner, | E080939 |
| v. | (Super.Ct.No. RIF1800692) |
| THE SUPERIOR COURT OF RIVERSIDE COUNTY, | OPINION |
| Respondent; | |
| THE PEOPLE, | |
| Real Party in Interest. | |

ORIGINAL PROCEEDINGS; petition for writ of mandate.  Bernard J. Schwartz, Judge.  Petition granted.

Steven L. Harmon, Public Defender, Brian G. Cosgrove, Allison Lowe, Deputy Public Defenders; American Civil Liberties Union Capital Punishment Project, Claudia Van Wyk, Robert Ponce; American Civil Liberties Union Foundation of Southern California and Summer Lacey, for Petitioner.

Complex Appellate Litigation Group, Kirstin M. Ault, Anna-Rose Mathieson; Boston University Center for Antiracist Research, Caitlin Glass, Asees Bhasin; Fred T. Korematsu Center for Law and Equality and Robert S. Chang, as Amici Curiae for Petitioner.

Cooley, Randall R. Lee; Reed Smith, Katelyn Kang; Robby L.R. Saldana and Elizabeth Reinhardt, for Amici Curiae Dean Chemerinsky and Law Professors and Legal Scholars, as Amici Curiae for Petitioner.

No appearance for Respondent.

Michael A. Hestrin, W. Matthew Murray and Kristen Allison, for Real Party in Interest.

Petitioner Russell Lynwood Austin (Petitioner) was charged by the Riverside County District Attorney's Office (the District Attorney) with two counts of murder for killing his girlfriend who was 12 weeks pregnant. It was further alleged that he used a deadly and dangerous weapon, a knife, and was charged with the special circumstance that he committed multiple murders. The District Attorney was seeking the death penalty.

Petitioner filed a motion claiming the District Attorney's decision to seek the death penalty violated the California Racial Justice Act of 2020 (CRJA) (Assem. Bill

No. 2542 (2019-2020 Reg. Sess.) Stats. 2020, ch. 317, § 1) (Assem. Bill 2542), which added section 745 to the Penal Code (first Motion).[1] Section 745 was enacted to prohibit the state from seeking or obtaining a criminal conviction on the basis of race. This included that a defendant could not be charged with a more serious offense than defendants of other races who have engaged in similar conduct and were similarly situated. (§ 745, subd. (a)(3).)

The trial court denied the first motion without prejudice. Petitioner filed a second motion providing additional evidence and argument. While a decision was pending, the CRJA was amended by the Racial Justice for All Act of 2022 (Assem. Bill No. 256 (2021-2022 Reg. Sess.) Stats. 2022, ch. 739, § 2) (Amended CRJA) (Assem. Bill 256). The trial court ruled that Petitioner had failed to make a prima facie showing of a violation as required under section 745, subdivision (c), and denied an evidentiary hearing.

The trial court denied Petitioner's motions finding that in order to make a prima facie case of racial discrimination under the CRJA and Amended CRJA, Petitioner must satisfy the following two-prong test: (1) Petitioner personally was being charged more harshly than similarly situated defendants of other races or ethnicities; and (2) statistical evidence shows a historic pattern of racial inequality in Riverside County's capital charging practice. The trial court found that Petitioner had satisfied the second prong, but statistics alone were not enough to establish the first prong, and therefore, he failed

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

to establish a prima facie case entitling Petitioner to an evidentiary hearing under the CRJA and Amended CRJA.

Petitioner petitions this court for a writ of mandate directing the superior court to (1) vacate its order denying Petitioner's request for a hearing on his CRJA claim, and (2) enter a new order granting an evidentiary hearing. Amici curiae briefs were submitted in support of Petitioner by (1) the Fred T. Korematsu Center for Law and Equity and several other centers for race, inequality and the law; and (2) Dean Erwin Chemerinsky and 10 law professors and legal scholars. They contend that this court should determine that in order to establish a prima facie case entitling Petitioner to an evidentiary hearing in the trial court, a defendant need only show statistical and aggregate evidence under the CRJA and Amended CRJA.

We agree in part with the trial court that based on the plain language of section 745, Petitioner was required to present not only statistical evidence of racial disparity in the charging of the death penalty by the District Attorney but also evidence of nonminority defendants who were engaged in similar conduct and were similarly situated but charged with lesser offenses, to establish a prima facie case. The plain language of section 745, subdivision (a)(3), requires evidence of similar conduct *and* similarly situated defendants, and the legislative history sheds no light on what is required to establish a prima facie case. There is nothing in the statute or the legislative history that provides guidance as to what evidence must be presented to determine similar conduct in order to establish a prima facie case. Let peremptory

4

However, as we explain *post*, based on the evidence presented in this case, which included factual evidence of nonminority defendants who committed murder but were not charged with the death penalty in cases involving similar conduct and who were similarly situated, e.g. had stabbed their victims or committed multiple murders, and statistical evidence that there was a history of racial disparity in charging the death penalty by the District Attorney, Petitioner met his burden of establishing a prima facie case under section 745, subdivision (a)(3). We need not determine based on the evidence presented whether only statistical evidence of similar conduct and similarly situated defendants would be sufficient to support a prima facie case. As such, the trial court should have ordered an evidentiary hearing at which the People could produce evidence of the relevant factors that were used to determine the charges against the nonminority defendants who were involved in similar conduct and who were similarly situated to petitioner, and provide any race-neutral reasons that it considered in deciding to charge petitioner with the death penalty in this case. We grant the writ petition ordering the trial court to conduct an evidentiary hearing.

**FACTUAL AND PROCEDURAL HISTORY**

A.      <u>FACTS AND CHARGES</u>

The parties presented the following facts in the Petition and return: On August 29, 2008, Petitioner killed his ex-girlfriend in her apartment. At the time of her death, the victim was 11 to 12 weeks pregnant with Petitioner's baby. When law enforcement arrived at the apartment, they found the victim with her throat cut. The victim's two-year-old son, K.C., was at the apartment during the murder but was unharmed.

5

Petitioner additionally provides in the Petition that during a counseling session years after the victim's murder, K.C. advised the therapist that his father, R.C., was present in the apartment the night the victim was murdered. Petitioner was arrested on February 6, 2018, based on DNA analysis completed on an unknown substance found on the victim's thigh. Petitioner had no prior criminal history and was 24 years old at the time of the offense.

Real party in interest provides that K.C. was found naked next to the victim's body, covered in blood. It was clear he had been with her dead body for some time. The victim's throat had been cut nearly to the point of decapitation.

Petitioner was charged by the District Attorney in an information with one count of murder (§ 187) of the victim, and with the special allegation that he personally used a deadly and dangerous weapon, a knife (§ 12022, subd. (b)(1)). In addition, he was charged with one count of murder (§ 187) of a fetus. He was charged with the special circumstances that he committed first degree murder and one or more additional murders in the first or second degree (§ 190.2, subd. (a)(3)). On May 15, 2019, the District Attorney provided notice to Petitioner that it intended "after review of all facts and circumstances underlying the charges" and his background, to seek the death penalty in the case.

B.     FIRST MOTION FOR RELIEF UNDER CRJA

Petitioner filed his Motion on July 26, 2022, seeking an evidentiary hearing pursuant to the CJRA. Petitioner contended that denial of the Motion would violate Petitioner's rights guaranteed by section 745, his right to equal protection of the law,

6

and be a miscarriage of justice. Petitioner provided an extensive history of racism in California. Petitioner provided statistics regarding the charging of African-American defendants in Riverside County from January 2016 through December 2021,[2] which were analyzed by Marisa Omori, Ph.D., a statistics professor. Petitioner argued this evidence, along with Omori's analysis, showed that African-American defendants received the harshest punishment of any racial or ethnic group in Riverside County. African-American defendants are charged with special circumstances in their murder cases at a rate of 64.86 per 100,000 of the adult population; Caucasians are charged at a rate of 5.00 per 100,000 of the adult population; and Hispanics are charged at a rate of 16.84 per 100,000 of the adult population. In addition, Riverside County filed a notice of intent to seek the death penalty against 22 defendants between 2016 through 2021. Per 100,000 of the adult population, 6.05 involved African-American offenders, 1.45 for Hispanic offenders, and .29 for Caucasian offenders. Petitioner argued that this statistical evidence was more than sufficient to make out a prima facie case under the CRJA. Petitioner contended that African-Americans are charged with more murders, special circumstances, and notices of intent to seek the death penalty than Caucasian offenders, which showed a violation of section 745, subdivision (a)(3).

The District Attorney filed a response to the Motion. They contended that Petitioner failed to show he was charged more seriously than defendants of other races, ethnicities, or national origins who are similarly situated. Petitioner had not shown the

---

[2] The data was collected by the Riverside County Public Defender's Office.

7

various variables that were considered in charging a defendant. The District Attorney argued that Petitioner had to compare the facts of cases involving nonminority defendants to the instant case. It was impossible for the trial court to consider whether petitioner was similarly situated based just on the statistics. Petitioner was charged with a multiple-murder special circumstance and one of the victims was an unborn child, which was a particularly heinous offense. The cases relied on by Petitioner did not involve this combination of charging. Further, the Omori study was flawed as she conceded no statistically significant difference in Caucasian and African-American groups based on the small sample size, and involved juvenile cases, which are not eligible for the death penalty.

Petitioner filed a reply to the People's opposition to the Motion. Petitioner stated that the history of racism provided in the Motion was relevant to whether he had met his burden of making a prima facie case. Further, the studies provided by Petitioner were sufficient to support he made out a prima facie case; they had met their similarly situated requirement.

Petitioner filed supplemental evidence in support of the Motion on September 28, 2022. He submitted two further statistical studies performed by Dr. Nick Peterson of the University of Miami and Dr. Frank Baumgartner of the University of North Carolina, Chapel Hill. Both addressed the racial disparities in charging, sentencing, and imposing the death penalty in Riverside County. Peterson's study relied on information on charging of cases in Riverside County between January 2007 and July 2019. The information included every case in which murder was charged, every case that a special

8

circumstance was filed, every case in which the District Attorney sought the death penalty, and every case in which the judge or jury imposed the death penalty. The list included 800 cases.

Petersen concluded that although only 20 percent of all murder defendants were African-American, they comprised 26 percent of those charged with special circumstances, 39 percent of those who received death notices, and 36 percent of those who received death sentences. In contrast, 25 percent of all murder defendants were Caucasian, but only 18 percent received special circumstance charges, 9 percent received death penalty notices, and 4 percent received death sentences. Petersen also took into account whether legitimate case characteristics or other nonracial factors, such as prior convictions, could account for the disparity.

Petersen controlled for defendant race/ethnicity and prior criminal history, victim race/ethnicity, age, and gender, and other characteristics, such as multiple victims, use of a firearm, and crime location. Even taking into account these variables, African-American defendants were 1.71 times more likely to be charged with a special circumstance, 9.06 times more likely to receive a death penalty notice, and 14.09 times more likely to receive a death sentence than Caucasian defendants. This proved that African-American defendants received special circumstances and death penalty notices between 2007 and 2019 at significantly higher rates relative to their proportion of the population. The death penalty was more frequently sought in cases involving multiple victims and prior felony convictions in all cases. Cases involving non-Caucasian

9

victims were less likely to receive the death penalty than those cases involving a Caucasian victim.

A further study was submitted that was prepared by Baumgartner. He found that since 1972, minority defendants comprised 66 percent of older defendants sentenced to death in Riverside County while Caucasian defendants comprised only 25 percent.

Petitioner argued that he had a low burden to make a prima facie showing under section 745. All of the studies submitted supported that African-American defendants in Riverside County were more likely to be charged with murder and the death penalty to be sought than nonminority defendants. Riverside County's capital system operated in a racially disparate manner. The trial court should order an evidentiary hearing as Petitioner had satisfied his burden under section 745, subdivision (c).

Petitioner included as exhibits the studies completed by Petersen and Baumgartner. In addition, a Riverside County racial history timeline was included as an exhibit.

Petitioner also filed a supplemental reply in support of motion for a hearing and relief pursuant to the racial justice act. Petitioner was relying on the studies from Omori, Baumgartner, and Petersen. Petitioner also noted that Governor Newsom had signed the Amended CRJA. The changes made clarified that Petitioner was entitled to an evidentiary hearing. The supplemental evidence presented by Petitioner on September 28, 2022, established the existence of racial disparities even taking into account "similarly situated" cases. Petitioner also argued that section 745, subdivision (a)(4)(A), which involved longer and more severe sentences, was ripe for consideration.

10

Petitioner argued he had a low burden to make a prima facie case of a violation of section 745, subdivision (a). Omori's study alone met the prima facie showing. She had looked at 689 cases in Riverside County from January 1, 2016, through January 1, 2022, for racial disparities. In 246 of those cases, at least one special circumstance was charged, and in 22 the death penalty was sought. Overall, African-American defendants were charged with murder and special circumstances more than Caucasian defendants, relative to their population in Riverside County. As for the death penalty, of the 22 cases, African-American defendants consisted of seven of the defendants and Caucasian defendants numbered two. This was statistically important based on their relative population.

Moreover, the Amended CRJA had defined "similarly situated" to mean that factors that are relevant in charging and sentencing are similar and do not require that all individuals in the comparison group are identical. Petersen's analysis included controls for variables on capital charging and sentencing decisions, such as multiple victims and prior felony convictions.

The District Attorney filed a response to the supplemental reply filed by Petitioner after the Amended CRJA had been passed. Based on the changes to the CRJA, the District Attorney argued it was clear that Petitioner must show in making out a prima facie case more than just statistics. The trial court must look to all of the relevant factors in charging and sentencing.

The matter was heard on October 28, 2022. Petitioner's counsel argued that in order to show a violation of section 745, a showing of intentional discrimination was

11

unnecessary.  Moreover, Petitioner was not required to find identical cases to meet the similarly situated burden.  The evidence presented in the Motion was more than enough to make out a prima facie case.  According to Omori's study, African-American defendants were overrepresented in charging and seriousness of the charges in relation to their representation in a population.  Based on Omori's study, there was such a great disparity that "there's more than a mere possibility that similarly situated defendants are being treated differently."  Moreover, Petersen's study had isolated criminal history, racial variables, and severity of the case in his analysis.

The trial court inquired, "So you have to look at, certainly, the charges that . . . Mr. Austin [is] facing, the facts and circumstances that are alleged in the crime, any prior records that they may have, and all the other factors that I just discussed [such as victim characteristics, completion of parole and probation, and facts of the case].  And then somehow compare that to a nonminority defendant similarly situated with a similar record and similar facts. . . .  [¶]  It's not just a simple matter of looking at statistics.  We're looking at the individual, the facts in that case."

Petitioner argued that the above evidence was more properly considered at the evidentiary hearing.  The study by Petersen was sufficient for a prima facie showing.  Petitioner also argued the trial court was required to give the law a liberal interpretation because it was an ameliorative law.  The District Attorney argued that more than statistics were required to make out a prima facie case.  The trial court must look at the specifics of the cases.  The statistics could not capture the decisions made in charging the death penalty.

12

The trial court first ruled that in order to obtain a hearing, a defendant was required to show the similarly situated prong; Petitioner must show that he was being discriminated against as shown by nonminority defendants who are similarly situated but charged with lesser crimes. The trial court reviewed the wording of section 745.

The trial court found that a prima facie case had not been established. There was no doubt that the second prong—a historical pattern of racism—had been shown. However, Petitioner had failed to "offer any evidence to show that any systematic bias has manifested in they themselves being more harshly charged than similarly situated defendants of other races." Petitioner "offered no evidence that a defendant of a different race alleged to have committed domestic violence-related multiple murders of a pregnant woman and her fetus would be treated less harshly." Petitioner had failed to make a prima facie case for a violation of section 745. The Motion was denied without prejudice to allow Petitioner an opportunity to present additional evidence.

C.      SECOND MOTION FOR RELIEF UNDER CRJA

On December 6, 2022, Petitioner filed his Motion for a Hearing and Relief Pursuant to the Racial Justice Act (Second Motion). Petitioner sought an evidentiary hearing and an ultimate ruling barring the death penalty in his case. The Second Motion incorporated the evidence and arguments previously presented and provided further evidence. Petitioner argued that he need only show statistical proof in making a prima facie case and was not required to identify factually similar cases. The trial court's creation of a two-prong test contravened both the plain language of section 745 but also the Legislature's intent. Petitioner argued that the only showing that was required to be

made was through statistical and aggregate evidence that African-American defendants who are accused of special-circumstance murder are similarly situated to Caucasian people accused of murder but not charged with a special circumstance or the death penalty.

Petitioner further argued it would be nearly impossible to find comparable cases in order to show a prima facie case. Petitioner again relied on the studies from Omori, Petersen, and Baumgartner. These studies showed a prima facie case. Petitioner also argued that he had made a prima facie showing under both section 745, subdivision (a)(3) and (a)(4)(A). Petitioner concluded that the studies were sufficient. Those studies showed, "As a group, [Caucasian] people charged with murder, charged with special circumstances, and subject to death notices are similarly situated to [African-American] people who face each of these same charges. [Petitioner's] evidence shows that at each stage, [African-American] people are more likely to progress to the next stage than similarly situated [Caucasian] people."

Petitioner then provided evidence (although he disagreed it was necessary) of similar cases charged by the District Attorney involving nonminority defendants between 2016 and 2022. Petitioner recounted the facts of his own case.

Petitioner provided the background of several cases involving Caucasian persons charged with special circumstance multiple murder but in which the District Attorney did not seek the death penalty: Robert Lars Pape killed and burned three people. The District Attorney did not seek the death penalty against Pape and he was serving a life without possibility of parole (LWOP) sentence. Jared Bischoff killed a man who was

14

flirting with his girlfriend and then killed his girlfriend. Bischoff stabbed his girlfriend

six times until she bled to death. Bischoff was scheduled for trial, but the District

Attorney chose not to seek the death penalty. Andrew Burke stabbed to death his

adopted parents/grandparents and the District Attorney chose not to seek the death

penalty.

Petitioner also provided cases involving young Caucasian adult defendants:

James Coon, who was 26 years old at the time of his offense, robbed a clerk at a store at

gunpoint and then shot the clerk because he tried to take his photograph. The District

Attorney did not seek the death penalty against Coon. Melissa Unger, who was 23

years old at the time, was involved in a gang murder that involved the kidnapping and

torture of a victim. She pled guilty to voluntary manslaughter. Owen Skyler Shover,

who was accused of killing his 16-year-old girlfriend when he was 18 years old, and

was facing charges but the District Attorney did not seek the death penalty. He also

noted that Pape, Burke, and Bischoff were all young adults when they committed the

above murders. Petitioner was 24 years old when the alleged offense took place but he

was facing the death penalty.

Petitioner presented the "highly aggravated" murders by Caucasian defendants

for whom the District Attorney did not seek the death penalty. Maxamillion Eagle

raped and strangled a woman, throwing her body in a trash can. Eagle had a prior

conviction of assault with a deadly weapon. He was sentenced to LWOP. Noy Boukes

had a prior conviction of murder in 2016. Boukes drove his car to a location in Hemet

and shot and killed a fellow member of a White supremacist group. Boukes was given an LWOP sentence in 2019. He had several other prior convictions.

Petitioner also referenced Caucasian defendants who stabbed their victims but were not charged with the death penalty. In 2017, Mark Brierley allegedly killed a woman by stabbing her multiple times in the chest, neck, and face. He was sentenced to LWOP. Burke and Bischoff both stabbed their victims.

Finally, Petitioner provided cases involving Caucasian defendants who committed murders and had prior convictions. Ronald Ricks was a Caucasian man with a previous conviction of murder in Riverside County in 2017. He drove up to a house and fired multiple shots at persons standing in front of the house, killing one man. Trial was set for 2023 and the District Attorney did not seek the death penalty. Ricks had several other prior convictions. Boukes and Eagle both had prior convictions. Petitioner had no prior criminal history but these Caucasian men received lesser charges.

Based on the foregoing, Petitioner argued that the factual comparisons illustrated that the District Attorney's decision to seek the death penalty against him meant that he faced significantly harsher punishment than other similarly situated Caucasian defendants. Petitioner presented numerous exhibits, which included the studies by Omori, Baumgartner, and Petersen, and an exhibit outlining facts and charges in other cases filed in Riverside County, including the cases outlined in the Second Motion. The list was prepared by the Riverside County Public Defenders Office.

A hearing was held on January 20, 2023.  The trial court noted that the CRJA originally provided that racial bias could be shown by statistical evidence and that a defendant need not show that he or she was prejudiced.  The trial court acknowledged this language, but noted that after this, section 745 was amended to include the similarly situated language.  It was again amended to require similar offenses and similarly situated defendants in order to show a violation of section 745, subdivision (a)(3).  In the final, approved version, the language included that a defendant must be both similarly situated and engage in similar conduct as nonminority defendants.  The trial court inquired of Petitioner's counsel, "How else can I read that but the plain language that it would require a comparison from individuals who commit similar conduct and have similar offenses that they're looking at?"

The trial court stated there were several reasons why the District Attorney would charge the death penalty, including the severity of the case, the criminal history, and whether the victim's family wanted the death penalty.  Something more than statistical evidence was required in order to show similar conduct.  Petitioner argued that the case-specific evidence provided was sufficient to support a prima facie showing.  The trial court questioned whether the list took into account the wishes of the victim's family in seeking the death penalty.  The trial court again reiterated the statistical evidence showed the racial disparity necessary for the first prong.  The matter was continued in order for the District Attorney to file a response to the Second Motion.

The District Attorney filed their opposition to the Second Motion.  They argued the trial court should not rely on statistics alone as it would incentivize charging

Caucasian defendants with the death penalty. The People argued that 10 defendants mentioned in the Second Motion were not similarly situated to Petitioner. The District Attorney then provided reasons why the cases were different from Petitioner's case: (1) Brierly, who stabbed his wife 25 times when he intended to kill her new boyfriend but "lost" it when he saw her, was given a lesser sentence based on the plea bargaining by his counsel, the Riverside County Public Defender's Office; (2) Burke had a well-documented history of mental illness and Petitioner did not; (3) Unger's case should be reviewed in chambers with just the parties; (4) Pape had to be refiled because of the strength of the evidence and it was not clear what acts were committed by Pape and those by his codefendant who was under 18 years of age and could not be charged with the death penalty; (5) Bischoff's case involved a romantic relationship and several other participants and Petitioner's case differed in that it was a more vicious attack and a toddler was present; (6) Coon had no criminal history, he suffered from mental health issues and he only robbed the store for gas money; (6) Shover killed a man with whom he was involved in committing crimes, his motive was unclear and the body was never found so it could not be determined how the victim died; (7) Eagle was involved in a killing with several other transients and there were evidentiary issues; (8) Boukes killed a fellow gang member over a drug debt and only killed one person while Petitioner killed the pregnant victim and her son was found in her pool of blood; and (9) Ricks killed the victim in a drive-by shooting based on revenge but had no criminal history of committing violent crimes or murder. The People concluded that Petitioner had failed

18

to provide evidence that he was similarly situated to a defendant of another race who was charged with less serious crimes than in this case.

Petitioner filed a reply. Petitioner once again argued that he only needed to present statistical evidence to show that he was being charged with more serious crimes than other similarly situated nonminority defendants. Petersen's study was sufficient for a prima facie case. Petitioner also encouraged the trial court to look to other antidiscrimination statutes in California for guidance. This included discrimination in employment and housing cases. These cases did not require a showing of intent to discriminate or individual prejudice. Further, Petitioner had provided more than adequate examples of similarly situated nonminority defendants for whom the District Attorney chose not to seek the death penalty. He was entitled to a hearing on the merits of his case.

The Second Motion was heard again on February 24, 2023. Petitioner argued that aggregate evidence was sufficient if it took into account the similarly situated requirement. The evidence presented took into account this requirement. The wishes of the victim's family and strength of the evidence were irrelevant to explain racial differences in charging.

The trial court stated again that it was clear that pursuant to section 745, there was a twofold analysis that needed to take place. First was a statistical showing. "The other is viewing persons who are in a similar situation, having committed similar conduct, as to whether or not there's a disparity in their treatment." Clearly, the first element had been met by Petitioner. The trial court believed that factors such as

19

strength of the case, the victim's family's wishes, and the criminal history of the defendant were all relevant factors in finding similarly situated defendants.

The trial court found, "It appears sufficiently clear to me that the final language of the bill was intended to prevent the approach that was suggested by the defense, which is to simply permit relief based merely on population-wide charging disparities. Therefore, a statistical analysis by itself is not sufficient." It further stated that Petitioner had provided specific evidence to establish that he was being treated more harshly compared to defendants of other races. "And this is precisely the type of evidence that I believe is necessary and that the original motions lacked." However, Petitioner had still not met his burden.

The trial court noted the different factors that distinguished the proffered cases from Petitioner. Petitioner did not have a prior record but his crime was vicious, nearly decapitating his victim. Her young child was found near her body and her fetus did not survive. The trial court found, "So in a comparison analysis, which the Court needs to do to some degree to look at defendants that are similarly situated, it appears to the Court that there were explanations given separate and apart from the pure issue of race which distinguished those cases from the case[] of [Petitioner]." The Second Motion was denied and Petitioner filed this petition for writ of mandate seeking an order from this court that he had established a prima facie case of a violation of section 745 and order an evidentiary hearing.

**DISCUSSION**

Petitioner and amici curiae contend the trial court erred by employing a two-prong test for making a prima facie case of racial discrimination pursuant to section 745, subdivision (a)(3) and (a)(4).  Petitioner insists the trial court misinterpreted the plain language, the legislative intent, and policy aims of section 745, subdivision (a)(3) and (a)(4).  The plain language supports only aggregate and statistical evidence is required to make a prima facie case.

Real party in interest urges this court to uphold the superior court's interpretation of section 745, subdivision (a)(3).  Real party in interest argues that holding as requested by Petitioner, every defendant in Riverside County could file the same motion, citing the same statistics, and be entitled to an evidentiary hearing.  Real party in interest insists that based on the plain language of the statute, a court in evaluating a CRJA claim must consider factors relevant in charging and sentencing, including race-neutral reasons proffered by the prosecution.  Further, in looking at the legislative history, the Legislature included a similarly situated requirement after the first draft.  In the Amended CRJA, the Legislature added a similarly situated definition, emphasizing the importance of the factor.  At a minimum, a defendant must prove under section 745, subdivision (a)(3), that another defendant who is similarly situated received more lenient treatment because of their race.  Relying on statistics alone, the District Attorney would have an incentive to seek more death penalty sentences on Caucasian defendants, an inappropriate racial determination.

21

The parties agree that review in this case is de novo. "We review statutory interpretation questions de novo." (*Ventura County Deputy Sheriffs' Association v. County of Ventura* (2021) 61 Cal.App.5th 585, 590.)

A.    <u>SECTION 745</u>

The CRJA, effective January 1, 2021, added section 745 to the Penal Code. The Legislature enacted the CRJA with the express intent "to eliminate racial bias from California's criminal justice system" and "to ensure that race plays no role at all in seeking or obtaining convictions or in sentencing." (Assem. Bill 2542; Stats. 2020, ch. 317, § 2, subd. (i); see *Young v. Superior Court* (2022) 79 Cal.App.5th 138, 149-150.) Its goal is "to provide remedies that will eliminate racially discriminatory practices in the criminal justice system, in addition to intentional discrimination." (Stats. 2020, § 2 subd. (j).) In 2023 the Governor signed into law the Amended CRJA, which made several changes to section 745, effective January 1, 2023. Among the changes to the statute the Amended CRJA included several definitions of terms used and extended relief to any person whose case was final.

Section 745 was enacted, in part, to address *McCleskey v. Kemp* (1987) 481 U.S. 279, 295-299, 312, which found that there was "a discrepancy that appears to correlate with race" in death penalty cases in Georgia, but the court would not intervene without proof of a discriminatory purpose, concluding that we must simply accept these disparities as "an inevitable part of our criminal justice system."

A detailed outline of the language of section 745 and the legislative history is necessary. Section 745, subdivision (a), provides that "[t]he state shall not seek or

22

obtain a criminal conviction or seek, obtain, or impose a sentence on the basis of race, ethnicity, or national origin." A defendant may establish a violation of the CRJA in various ways. This case concerns the charging stage of the prosecutorial process.[3] Subdivision (a)(3) of section 745, provides in full, "The defendant was charged or convicted of a more serious offense than defendants of other races, ethnicities, or national origins who have engaged in similar conduct and are *similarly situated*, and the evidence establishes that the prosecution *more frequently sought or obtained* convictions for more serious offenses against people who share the defendant's race, ethnicity, or national origin in the county where the convictions were sought or obtained." (Italics added.)[4]

The Legislature defined "similarly situated" in section 745, subdivision (h)(6), as follows: " 'Similarly situated' means that factors that are relevant in charging and sentencing are similar and do not require that all individuals in the comparison group

---

[3] Petitioner and amici curiae also refer to subdivision (a)(4)(A) of section 745. It provides, "A longer or more severe sentence was imposed on the defendant than was imposed on other similarly situated individuals convicted of the same offense, and longer or more severe sentences were more frequently imposed for that offense on people that share the defendant's race, ethnicity, or national origin than on defendants of other races, ethnicities, or national origins in the county where the sentence was imposed." This provision only applies to persons who have been sentenced. This is further evidenced by the remedy for a violation of section 745, subdivision (a). Subdivision (e) of section 745 distinguishes between the remedies prior to judgment and those after the judgment. Petitioner has only been charged in this case. Accordingly, the proper provision entitling Petitioner to relief is section 745, subdivision (a)(3). We further decline to interpret section 745, subdivision (a)(4)(A), for future courts as requested by Petitioner as the issue is not properly before this court.

[4] We highlight those terms that are defined in section 745.

23

are identical.  A defendant's conviction history may be a relevant factor to the severity of the charges, convictions, or sentences.  If it is a relevant factor and the defense produces evidence that the conviction history may have been impacted by racial profiling or historical patterns of racially biased policing, the court shall consider the evidence."

Section 745, subdivision (h)(1), provides a definition of "More frequently sought or obtained" as that term appears in section 745, subdivision (a)(3).  It provides, " 'More frequently sought or obtained' or 'more frequently imposed' means that the totality of the evidence demonstrates a significant difference in seeking or obtaining convictions or in imposing sentences comparing individuals who have engaged in similar conduct and are similarly situated, and the prosecution cannot establish race-neutral reasons for the disparity.  The evidence may include statistical evidence, aggregate data, or nonstatistical evidence.  Statistical significance is a factor the court may consider, but is not necessary to establish a significant difference.  In evaluating the totality of the evidence, the court shall consider whether systemic and institutional racial bias, racial profiling, and historical patterns of racially biased policing and prosecution may have contributed to, or caused differences observed in, the data or impacted the availability of data overall.  Race-neutral reasons shall be relevant factors to charges, convictions, and sentences that are not influenced by implicit, systemic, or institutional bias based on race, ethnicity, or national origin."

"If a motion is filed in the trial court and the defendant makes a prima facie showing of a violation . . . the trial court shall hold a hearing."  (§ 745, subd. (c).)  A

prima facie showing means "that the defendant produces facts that, if true, establish that there is a substantial likelihood that a violation of subdivision (a) occurred. For purposes of this section, a 'substantial likelihood' requires more than a mere possibility, but less than a standard of more likely than not." (§ 745, subd. (h)(2).) If an evidentiary hearing is ordered, "evidence may be presented by either party, including, but not limited to, statistical evidence, aggregate data, expert testimony, and the sworn testimony of witnesses." (§ 745, subd. (c)(1).) "The defendant shall have the burden of proving a violation of subdivision (a) by a preponderance of the evidence. The defendant does not need to prove intentional discrimination." (§ 745, subd. (c)(2).)

B.     LEGISLATIVE HISTORY

As amended in the Senate on July 1, 2020, the draft of section 745 provided in subdivision (b)(4), that a violation of section 745 occurred if, "The prosecution sought or obtained a conviction for an offense for which convictions are more frequently sought or obtained against people who share the defendant's race, ethnicity, or national origin than for defendants of other races, ethnicities, or national origins in the county where the convictions were sought or obtained." (Sen. Amend. to Assem. Bill 2542 (2019-2020 Reg. Sess.) Aug. 1, 2020.) There was no requirement that a prima facie showing must be made prior to the holding of a hearing. There were not similarly situated or similar conduct requirements as appears in the current section 745, subdivision (a)(3).

On August 1, 2020, Assembly Bill 2542 was further amended to add a prima facie requirement. The proposed section 745, subdivision (a)(4), provision was

amended to read, "The defendant was charged or convicted of a more serious offense than defendants of other races, ethnicities, or national origins *who commit similar offenses* and the evidence establishes that the prosecution more frequently sought or obtained convictions for more serious offenses against people who share the defendant's race, ethnicity, or national origin in the county where the convictions were sought or obtained."  A definition of "prima facie" was included.  (Sen. Amend. to Assem. Bill 2542 (2019-2020 Reg. Sess.) Aug. 1, 2020, italics added.)

A Senate Committee on Public Safety history of the August 1, 2020 version, referred to *McCleskey*.  In addition, it provided, "This bill allows racial bias to be shown by, among other things, statistical evidence that convictions for an offense were more frequently sought or obtained against people who share the defendant's race, ethnicity or national origin in the county where the convictions were sought or obtained; . . . This bill does not require the discrimination to have been purposeful or to have had prejudicial impact on the defendant's case."  (Sen. Com. on Public Safety, Analysis of Assem. Bill 2542 (2019-2020 Reg. Sess.) Aug. 7, 2020.)

Further amendments were proposed on August 20, 2020.  Proposed section 745, subdivision (d)(4) now provided, "The defendant was charged or convicted of a more serious offense than defendants of other races, ethnicities, or national origins *who commit similar offenses and are similarly situated*, and the evidence establishes that the prosecution more frequently sought or obtained convictions for more serious offenses against people who share the defendant's race, ethnicity, or national origin in the county where the convictions were sought or obtained."  The definition of "prima facie

26

showing" was amended.  (Sen. Amend. to Assem. Bill 2542 (2019-2020 Reg. Sess.) Aug. 20, 2020, italics added.)  Nothing in the legislative history provides the reason for the addition of the "similarly situated" language or its impact on the prima facie showing.

Assembly Bill No. 256 was introduced to amend section 745 on January 14, 2021.  It initially just sought to expand relief to those whose cases were final prior to 2021.  (Assem. Bill 256, Introduction of Bill.)  The Senate amendment to Assembly Bill 256 provided the following language:  "Under existing law, a conviction or sentence is unlawfully imposed on the basis of race, ethnicity, or national origin if the defendant proves, among other things, that the defendant was charged or convicted of a more serious offense than defendants of other races, ethnicities, or national origins, or received a longer or more severe sentence, and the evidence establishes that the prosecution more frequently sought or obtained convictions for more serious offenses against people who share the defendant's race, ethnicity, or national origin, as specified, or if a longer or more severe sentence was more frequently imposed on defendants of a particular race, ethnicity, or national origin, as specified.  Existing law requires this determination to be made pursuant to statistical evidence or aggregate data, as specified. [¶]  This bill would allow that evidence to include nonstatistical evidence and would require the court to consider the totality of the evidence in determining whether a significant difference in seeking or obtaining convictions or in imposing sentences has been established."  The current provision of section 745, subdivision (a)(3), was proposed and the further definitions of relevant factors and changes to the definition of

27

"more frequently" obtained were proposed.  (Sen. Amend. to Assem. Bill 256 (2021-2022 Reg. Sess.) Aug. 11, 2022.)

Further amendments were proposed on August 24, 2022, which included the current version of section 745, subdivision (a)(3), and all of the definitions outlined *ante*.  The "Assembly Floor Analysis" showed that the amendments were intended to clarify that "more serious charges or longer or more severe sentences were 'more frequently sought or obtained' or 'more frequently imposed' is based on the totality of the evidence, which may include statistical evidence, aggregate data, or nonstatistical evidence."  (Assembly Floor Analysis – Concurrence in Sen. Amend to Assem. Bill 256 (2021-2022 Reg. Sess.) August 30, 2022.)  There was no further explanation of the reason for the changes, and how this language impacted the prima facie showing or the evidentiary hearing phase.

## C.     ANALYSIS

When interpreting a statute, we look to its words to "ascertain the intent of the Legislature." (*People v. Overstreet* (1986) 42 Cal.3d 891, 895-896.)  "When statutory language is clear and unambiguous, there is no need for construction and courts should not indulge in it. (*Ibid*.)  "Because statutory language generally provides the most reliable indicator of that intent [citation], we turn to the words themselves, giving them their 'usual and ordinary meanings' and construing them in context.  [Citation.]  ' "If there is no ambiguity in the language of the statute, '. . . the Legislature is presumed to have meant what it said, and the plain meaning of the statute governs.' " ' " (*People v. Lawrence* (2000) 24 Cal.4th 219, 230-231.) "If the language of a statutory provision

28

remains unclear after we consider its terms, structure, and related statutory provisions, we may take account of extrinsic sources—such as legislative history—to assist us in discerning the relevant legislative purpose." (*Gund v. County of Trinity* (2020) 10 Cal.5th 503, 511.)

### 1. *PRIMA FACIE CASE REQUIREMENTS*

Section 745, subdivision (c)(1), makes it clear that at an evidentiary hearing, evidence may include "statistical evidence, aggregate data, expert testimony, and the sworn testimony of witnesses." However, it is not clear what type of evidence is necessary to prove a prima facie case of a violation of section 745, subdivision (a)(3). The plain language of section 745, subdivision (a)(3), clearly provides that in order to show a violation, a defendant must show that he was charged with a more serious offense than defendants of other races "who have engaged in similar conduct and are similarly situated," *and* "that the prosecution more frequently sought or obtained convictions for more serious offenses against people who share the defendant's race, ethnicity, or national origin in the county where the convictions were sought or obtained." As stated, " 'More frequently sought or obtained,' " "means that the totality of the evidence demonstrates a significant difference in seeking . . . convictions . . . comparing individuals who have engaged in similar conduct and are similarly situated, and the prosecution cannot establish race-neutral reasons for the disparity." (§ 745, subd. (h)(1).) Despite these definitions, there is nothing in the plain meaning of the statute that provides what evidence is necessary to establish a prima facie case of a violation of section 745, subdivision (a)(3).

The legislative history does not give any insight into the required proof to make a prima facie showing. In its original proposed form, there was no similarly situated nor similar conduct requirement as appears in section 745, subdivision (a)(3), nor a requirement that a prima facie showing was required prior to a hearing. However, the statute evolved to include these requirements and we must give meaning both to these changes made by the Legislature and the plain meaning of the statute.

Petitioner and amici curiae focus on the "similarly situated" language in section 745, subdivision (a)(3). Petitioner claims that the plain language of section 745, subdivision (a)(3), permits a defendant to establish a CRJA violation by making one evidentiary showing based on statistical proof. Petitioner insists that in order to prevail in showing a prima facie case under the CRJA, a defendant "would have to show—and could make the showing with statistical or aggregate evidence—that [African-American] people accused of special-circumstance murder are similarly situated to [Caucasian] people accused of murder but not charged with a special circumstance." Aggregate evidence can be used to show both the greater frequency of punitive treatment and similar situations of comparators. However, Petitioner does not explain in either the Petition or traverse the importance of the language that Petitioner must show that he was "engaged in similar conduct" as other nonminority defendants in addition to showing he was similarly situated.

In the amici brief filed by Dean Erwin Chemerinsky and other law professors, they also focus on the similarly situated language. They contend Petitioner was not required to provide exact comparators to establish a prima facie case. They do not

address the "similar conduct" language. The Korematsu Center for Law and Equality contends that the statistical studies presented by Petitioner were sufficient to establish a prima facie case. Korematsu argues that the trial court "ignored this legislative directive" and imposed a nearly insurmountable barrier to making a prima facie showing of a CRJA violation. They insist that statistical analysis of racial disparities alone can show more than a "mere possibility" of disparate treatment based on race, and that statistical analysis is enough without knowing the individual circumstances. The studies by Omori, Petersen, and Baumgartner were sufficient to show more than a "mere possibility" of a violation of subdivision (a) of section 745. However, the brief also does not address the "similar conduct" language.

At oral argument, Petitioner's counsel did acknowledge that there is a requirement that the evidence must establish similar conduct. Petitioner's counsel also stated that similar conduct could be shown by statistics alone, factual evidence or a combination of both types of evidence.

The plain language of the statute supports that as part of the prima facie showing, a defendant must show that nonminority defendants are engaged in similar conduct. "Conduct" is defined as "a mode or standard of personal behavior especially as based on moral principles." (Merriam–Webster's Online Dict. (2023) < http://www.merriam-webster.com/dictionary> [as of Jan. 8, 2024] definition noun.) In criminal cases, Evidence Code sections 1108 and 1109 allow for admission of uncharged "conduct" that is similar to the current charged offense to prove that the person did in fact commit the current charged acts. This involves the admission of the facts of the uncharged

31

similar conduct.  (See Evid. Code, §§ 1108, 1109; *People v. Nguyen* (2010) 184 Cal.App.4th 1096, 1115-1118.)  The Legislature, prior to using the term "similar conduct," used the term "similar offenses," in addition to the similarly situated language.  Similar "offense" language has been used in the discussion of admission of other crimes to help show motive, intent, premeditation, or presence of a common design or plan.  (See *People v. Balcom* (1994) 7 Cal.4th 414, ["evidence that defendant committed uncharged similar offenses would have some relevance regarding defendant's intent in the present case."].)  "With particular regard to the determination of relevance, '. . . the trial court must look behind the label describing the kind of similarity or relation between the other offense and the charged offense; it must examine the precise elements of similarity between the offenses with respect to the issue for which the evidence is proffered and satisfy itself that each link of the chain of inference between the former and the latter is reasonably strong.' "  (*People v. Enos* (1973) 34 Cal.App.3d 25, 35.)  While it is unclear as to why the Legislature changed the term "similar offense" to "similar conduct," both traditionally have referred to the underlying facts of the crimes and not simply the charged crimes.  Since the Legislature did not provide a definition of "similar conduct" we rely on the plain meaning, which refers to "behavior" of a person on a particular occasion that logically refers to the underlying facts of the crimes rather than just a recitation of the charged crime, and as the term has traditionally been used in other criminal cases.

While we may agree with Petitioner that only relying on the word "similarly situated" and the definition in the Amended CRJA, it may be sufficient to look only at

32

similar crimes, such as murder, to show how an African-American person may be charged more harshly than a nonminority defendant on these cases and that this could be shown by only statistical evidence. It seems clear to this court that "similar conduct" requires some sort of review of the underlying facts of the other cases. While there may be a situation in which statistics could somehow show similar conduct and similarly situated amongst defendants, in this case, Petitioner presented the underlying facts of several cases in which the District Attorney did not seek the death penalty for non-minority defendants. As such, we need not determine if statistics alone could meet the prima facie burden as factual evidence here was presented to establish similar conduct.

As stated, the language of section 745 does not clarify what must be shown at the prima facie stage and what should be decided at the evidentiary hearing. However, it is clear from the language that to prove a prima facie case of a violation under section 745, subdivision (a)(3), the evidence must establish that Petitioner was *similarly situated* and engaged in *similar conduct* with other nonminority defendants who were charged with lesser crimes, and that there was racial disparity in the District Attorney's capital charging system. Petitioner's counsel conceded at oral argument that factual evidence of similar conduct could support a prima facie case. The evidence presented by Petitioner in the Second Motion of other current cases involving nonminority defendants was proper evidence of similar conduct. Based on this factual evidence, we need not determine if mere statistical evidence that compares groups who are engaged in similar conduct and similar situations may be enough to make a prima facie showing under section 745.

33

## 2. *BURDEN OF SHOWING A PRIMA FACIE CASE*

The question then remains whether the trial court erred by finding that this evidence was insufficient to establish a prima facie case by requiring that Petitioner provide an explanation of other relevant factors in sentencing at the prima facie stage, such as whether the victim's family supported seeking the death penalty, to explain the racial disparity in seeking the death penalty. It is not clear from either the plain language of the statute or the legislative history at what stage the trial court considers this evidence and what type of evidence is relevant to showing a prima facie case or proving a violation at an evidentiary hearing.

Amici curiae argue that placing the burden on the section 745 movant to address the nondiscriminatory reasons for charging as part of a prima facie case is inconsistent with existing antidiscrimination law and the process in section 745. Further, the plain language of the statute places the burden of producing race-neutral reasons on the prosecution. They further argue that many of the variables cannot be attained by a defendant at the prima facie stage of litigation. But the briefs provide little assistance in helping this court determine what must be shown in order to establish a prima facie case. While the briefs argue statistics showing that Petitioner was similarly situated to nonminority defendants who were charged with less serious crimes is sufficient, as set forth *ante* this ignores the plain language of the statute that requires not only a showing of similarly situated defendants but also those engaged in similar conduct. Further, it ignores that the definition of similarly situated provides that "factors that are relevant in charging and sentencing are similar." (§ 745, subd. (h)(6).)

34

A recent Court of Appeal case from San Francisco looked to habeas corpus law to determine the standard for making a prima facie case. In *Finley v. Superior Court* (2023) 95 Cal.App.5th 12 (*Finley*), an African-American defendant brought a motion in the trial court alleging a violation of the CRJA based on his vehicle being searched while he was parked in a known high-crime area. He provided evidence that the officer had no logical nonracial reason for stopping and searching him and provided statistical evidence that African-American persons in San Francisco are far more likely to be stopped by police than other groups. (*Id.* at pp. 17-18.)[5] The trial court denied the motion finding that a prima facie case had not been met. On appeal, the defendant argued that the trial court improperly weighed the evidence in concluding that he did not make a prima facie case. (*Id.* at p. 20.)

On appeal, the court looked to the prima facie standard applicable to a petition for a writ of habeas corpus, noting that there were no cases interpreting section 745. It noted in the habeas context, "[t]o establish a prima facie showing for habeas corpus relief, a petitioner 'should both (i) state fully and with particularity the facts on which relief is sought [citations], as well as (ii) include copies of reasonably available documentary evidence supporting the claim, including pertinent portions of trial transcripts and affidavits or declarations.' " (*Finley*, *supra*, 95 Cal.App.5th at p. 21.) It

---

[5] The defendant in *Finley* brought his claim pursuant to section 745, subdivision (a)(1), which provides, "[t]he judge, an attorney in the case, a law enforcement officer involved in the case, an expert witness, or juror exhibited bias or animus towards the defendant because of the defendant's race, ethnicity, or national origin."

concluded that in order to show a prima case under the CRJA, a defendant "must state fully and with particularity the facts on which relief is sought, and include copies of reasonably available documentary evidence supporting the claim. The court should accept the truth of the defendant's allegations, including expert evidence and statistics, unless the allegations are conclusory, unsupported by the evidence presented in support of the claim, or demonstrably contradicted by the court's own records. [Citation.] And again, the court should not make credibility determinations at the prima facie stage." (*Id.* at p. 23, fn. omitted.)

As we have stated, the Legislature did not provide a standard for making a prima facie case. However, while it is not possible for this court to know the intended standard under section 745, *Finley*'s analysis provides a reasonable standard based on long-standing habeas corpus law.

Here, it is clear to this court that the statistical evidence of racial disparity presented by way of the studies by Omori, Petersen, and Baumgartner was sufficient to show a prima facie case of racial disparity in the charging of the death penalty in Riverside County. Moreover, Petitioner provided evidence to show nonminority defendants in Riverside County were charged with lesser crimes despite being engaged in similar conduct as Petitioner, e.g. stabbings or multiple murders. The trial court found that Petitioner had failed to provide cases that were similarly situated based on other factors in the cases involving nonminority defendants. It concluded there could be other reasons that the death penalty may not have been sought in those cases. This included whether the victim's family wanted the District Attorney to pursue the death

penalty.  Hence, it placed the burden on Petitioner at the prima facie stage to prove that the factors relevant in charging the nonminority defendants were similar to his case, and arguably, prove there were no race-neutral reasons for the differences in the charges.

The language of the statute and the legislative history give this court no guidance as to how or when a defendant must prove that "factors that are relevant in charging . . . are similar. . . ."  (§ 745, subd. (h)(6).)  However, section 745, subdivision (h)(1), provides that the District Attorney is responsible for providing race-neutral reasons for the disparity in charging Petitioner with the death penalty.  As stated, the definition in section 745, subdivision (h)(1), provides that, " 'More frequently sought or obtained' " means "the totality of the evidence demonstrates a significant difference in seeking or obtaining convictions . . . comparing individuals who have engaged in similar conduct and are similarly situated, and the prosecution cannot establish race-neutral reasons for the disparity."

The statute provides that evidence of race-neutral reasons for racial disparity is to be presented by the District Attorney, not Petitioner.  As such, it follows that the presentation of evidence of race-neutral reasons is a defense after the prima facie case has been shown.  It is not entirely clear if the burden also falls on the District Attorney to show the relevant factors that were used in deciding to charge both the nonminority defendants and Petitioner.  As defined, race-neutral reasons "shall be relevant factors to charges . . . that are not influenced by implicit, systemic, or institutional bias based on race, ethnicity, or national origin."  (§ 745, subd. (h)(1).)

Based on the foregoing, if the defendant provides statistical evidence showing a racial disparity in the charging of nonminority defendants and African-American defendants, and provides evidence of nonminority defendants who engage in similar conduct and are similarly situated but were charged with lesser crimes than the charged African-American defendant, that this is sufficient to show there was more than a mere possibility that a violation of section 745, subdivision (a), has occurred. As such, a defendant has met his burden of establishing a prima facie case. An evidentiary hearing should be ordered at that point to consider all of the relevant factors in charging and allow the District Attorney to present race-neutral reasons for the disparity in seeking the death penalty.

While we cannot establish a bright-line rule of what constitutes sufficient evidence of "similar conduct" in all cases, here, Petitioner in the Second Motion provided the facts of several cases that shared many of the same characteristics as this case, including other stabbings and multiple murders committed by nonminority defendants who were not charged with the death penalty. In addition, Petitioner presented ample evidence that the District Attorney's capital system more frequently sought convictions for more serious offenses against African-American defendants. This was enough to provide more than a "mere possibility" that a violation of section 745, subdivision (a)(3), had occurred. The trial court erred by finding Petitioner did not establish a prima facie showing of a violation. Once Petitioner presented this evidence, the trial court should have ordered an evidentiary hearing at which the burden shifted to the District Attorney to show the race-neutral reasons for the disparity in seeking the

38

death penalty against Petitioner, which include the relevant factors to charges that were not influenced by implicit or systemic racial bias.  The trial court, after receiving such evidence, could then make a decision based on the totality of the evidence.

**DISPOSITION**

Let a writ of mandate issue directing the Superior Court of Riverside County to vacate its order denying Petitioner's request for a hearing, and to conduct an evidentiary hearing as set forth in this opinion.  The stay ordered on May 4, 2023, is LIFTED.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

MILLER
Acting P. J.

I concur:

CODRINGTON
J.

[*Austin v. Superior Court*, E080939]

MENETREZ, J., Concurring.

Defendant Russell Lynwood Austin was charged in Riverside County Superior Court with murder with special circumstances, and the prosecution gave notice that it intended to seek the death penalty. Austin filed a motion for a hearing under the California Racial Justice Act of 2020 (Stats. 2020, ch. 317, § 1) (RJA). Austin, who is Black, presented statistical evidence showing significant racial disparities concerning the death penalty in Riverside County. The evidence showed that Black defendants are charged with murder, charged with special circumstances, and subject to death notices at rates far higher than their proportion of the adult population in Riverside County, and that the corresponding rates for White defendants are far lower than their proportion of the adult population. Austin's statistical evidence also included regression analyses showing that (1) "[e]ven after controlling for important legally relevant factors like the presence of multiple victims or a felony, logistic regression results indicate that murders with Black and Hispanic defendants are more likely to involve a special circumstance, a death notice, and a death verdict," (2) similar disparities occur with respect to Black victims and White victims, and (3) the disparities "are especially pronounced in cases involving White victims and minority defendants."

The trial court denied Austin's motion without prejudice, ruling that more than statistical evidence is required to make a prima facie case under the RJA. Austin then filed a second motion seeking the same relief, supported both by the statistical evidence proffered in support of the first motion and by additional, nonstatistical evidence, in an

1

effort to meet the standard set by the court when it denied the first motion. The court denied the second motion, concluding that Austin's evidence was still not sufficient to make a prima facie case.

In his petition for writ review of the trial court's rulings, Austin argues that statistical evidence can be sufficient on its own to make a prima facie case of a violation of the RJA, and he argues that his statistical evidence was in fact sufficient. I agree, and I would grant the petition on that basis.

A.     *Statutory Background*

The RJA provides that "[t]he state shall not seek or obtain a criminal conviction or seek, obtain, or impose a sentence on the basis of race, ethnicity, or national origin." (Pen. Code, § 745, subd. (a); unlabeled statutory citations are to this code.) The statute further "sets forth four categories of conduct, any of which, if proved, is enough to 'establish' a violation of section 745, subdivision (a)." (*Young v. Superior Court* (2022) 79 Cal.App.5th 138, 147 (*Young*).) One of the categories under which Austin seeks relief is subdivision (a)(3) of section 745: "The defendant was charged or convicted of a more serious offense than defendants of other races, ethnicities, or national origins who commit similar offenses and are similarly situated, and the evidence establishes that the prosecution more frequently sought or obtained convictions for more serious offenses against people who share the defendant's race, ethnicity, or national origin in the county where the convictions were sought or obtained." The statute also explains that "'[m]ore frequently sought or obtained' or 'more frequently imposed' means that the totality of the evidence demonstrates a significant difference in seeking or obtaining convictions or in

imposing sentences comparing individuals who have engaged in similar conduct and are similarly situated, and the prosecution cannot establish race-neutral reasons for the disparity." (§ 745, subd. (h)(1).)

If a defendant files a motion alleging a violation of subdivision (a) of section 745, and the defendant "makes a prima facie showing" of such a violation, then "the trial court shall hold a hearing." (§ 745, subd. (c).) The statute defines "prima facie showing" as follows: It "means that the defendant produces facts that, if true, establish that there is a substantial likelihood that a violation of subdivision (a) occurred. For purposes of this section, a 'substantial likelihood' requires more than a mere possibility, but less than a standard of more likely than not." (§ 745, subd. (h)(2).)

At the subsequent hearing conducted if the defendant makes a prima facie showing, "evidence may be presented by either party, including, but not limited to, statistical evidence, aggregate data, expert testimony, and the sworn testimony of witnesses. The court may also appoint an independent expert. For the purpose of a motion and hearing under this section, out-of-court statements that the court finds trustworthy and reliable, statistical evidence, and aggregated data are admissible for the limited purpose of determining whether a violation of subdivision (a) has occurred." (§ 745, subd. (c)(1).) At the hearing, the defendant bears the burden of proof by a preponderance of the evidence, but "[t]he defendant does not need to prove intentional discrimination" in order to prevail. (§ 745, subd. (c)(2).)

B.　McCleskey, *the RJA, and Statistical Evidence*

In my view, the relationship between the RJA and *McCleskey v. Kemp* (1987) 481 U.S. 279 (*McCleskey*) shows that the trial court's ruling—that statistical evidence cannot be sufficient to make a prima facie case—cannot be correct.

In *McCleskey*, a defendant who had been sentenced to death in Georgia argued that his conviction and sentence were unconstitutional because statistical evidence "show[ed] a disparity in the imposition of the death sentence in Georgia based on the race of the murder victim and, to a lesser extent, the race of the defendant," a disparity that persisted "even after taking account of 39 nonracial variables." (*McCleskey*, *supra*, 481 U.S. at pp. 286-287.)　The Supreme Court rejected the defendant's constitutional claim, concluding that the statistical evidence "[a]t most . . . indicates a discrepancy that appears to correlate with race." (*Id.* at p. 312.)　The court reaffirmed "the basic principle that a defendant who alleges an equal protection violation has the burden of proving 'the existence of purposeful discrimination.'" (*Id.* at p. 292.)　And the court concluded that the statistical evidence before it was "clearly insufficient to support an inference that any of the decisionmakers in McCleskey's case acted with discriminatory purpose." (*Id.* at p. 297.)　Four justices dissented, with Justice Brennan observing that the majority's concern "that recognition of McCleskey's claim would open the door to widespread challenges to all aspects of criminal sentencing . . . seems to suggest a fear of too much justice." (*Id.* at p. 339 (dis. opn. of Brennan, J.).)

"There is little doubt which side of the *McCleskey* debate our Legislature has aligned California with by statute." (*Young*, *supra*, 79 Cal.App.5th at p. 152.)　The RJA's

legislative findings cite *McCleskey* for the proposition that "[e]xisting precedent . . . accepts racial disparities in our criminal justice system as inevitable" (Assem. Bill No. 2542 (2019-2020 Reg. Sess.) § 2, subd. (f) (Assembly Bill 2542)), and the findings then state that "[i]t is the intent of the Legislature to reject the conclusion that racial disparities within our criminal justice are inevitable, and to actively work to eradicate them" (*id.*, subd. (i)). Directly contrary to *McCleskey*'s requirement that an equal protection claimant prove "purposeful discrimination" (*McCleskey*, *supra*, 481 U.S. at p. 292), the findings acknowledge the existence of "implicit bias," which is "often unintentional and unconscious," and the findings express the Legislature's intent "to remedy the harm to the defendant's case and to the integrity of the judicial system" caused by such bias (Assem. Bill 2542, § 2, subd. (i)). Accordingly, the RJA provides that "[t]he defendant does not need to prove intentional discrimination." (§ 745, subd. (c)(2).)

Considered in light of that background, the trial court's conclusion that statistical evidence cannot be sufficient to make a prima facie case under the RJA must be mistaken. *McCleskey* held that statistical evidence cannot be sufficient to prove purposeful discrimination and hence cannot be sufficient *to prevail* on an equal protection claim. In enacting the RJA, the Legislature expressly rejected *McCleskey* and the requirement to prove intentional discrimination, expressly seeking to provide remedies for implicit bias even though it is "often unintentional and unconscious" (Assem. Bill 2542 (2019-2020 Reg. Sess.) § 2, subd. (i)). Thus, it cannot reasonably be denied that the Legislature intended that relief be more broadly available under the RJA than under *McCleskey*. But if the trial court were right that statistical evidence cannot be sufficient

5

*even for a prima facie case* under the RJA, then the RJA would be *narrower* than *McCleskey*, which held only that statistical evidence cannot be sufficient *to prevail*.

Other aspects of the statutory language further support that conclusion. First, the Legislature set a low standard for a prima facie case under the RJA: The defendant need only show that there is "more than a mere possibility" that subdivision (a) of section 745 has been violated. (§ 745, subd. (h)(2); see also *Finley v. Superior Court* (2023) 95 Cal.App.5th 12, 21-22 [discussing the standard for a prima facie case under the RJA, which is lower than the prima facie standard for writs of habeas corpus].) It is hard to see how the following three propositions can be reconciled: (1) *McCleskey* held that statistical evidence by itself is not sufficient to prevail; (2) the Legislature intended to create a broader remedial scheme than *McCleskey*; but (3) the Legislature provided that statistical evidence by itself is not sufficient even to show *more than a mere possibility* of prevailing. The reasonable inference is that statistical evidence can be sufficient to make a prima facie case.

Second, the RJA provides that for purposes of a claim of disparate treatment under subdivision (a)(3) of section 745, the burden is on the prosecution to "establish race-neutral reasons for the disparity." (§ 745, subd. (h)(1); see § 745, subd. (a)(3).) It follows that *in order to prevail* on a claim under subdivision (a)(3) of section 745 a defendant is not required to negate every possible race-neutral reason for the disparate treatment. Rather, the burden is on the prosecution to prove such reasons. A fortiori, the defendant need not negate every possible race-neutral reason for the disparate treatment

6

*in order to make a prima facie case*.  Showing the disparate treatment itself—which can be done through statistical evidence—is enough.

Nothing in the statutory language requires a contrary conclusion.  The trial court focused on the requirement in subdivision (a)(3) of section 745 that "[t]he defendant was charged or convicted of a more serious offense than defendants of other races, ethnicities, or national origins who have engaged in similar conduct *and are similarly situated*." (Italics added.)  The court concluded "that there has to be some showing more than statistical analysis that individually these defendants . . . are being discriminated against, vis-a-vis, nonminority defendants that are similarly situated, with similar cases, charges, and all of the other factors that go into it."  The court thus appears to have inferred from the statutory language that Austin needed to produce evidence that there was another defendant who was similar to Austin in all material respects ("all of the other factors that go into it") but as to whom the prosecution did not seek the death penalty.

No such inference is warranted.  Again, if statistical evidence cannot be sufficient for a prima facie case under the RJA, then the RJA is narrower than *McCleskey* despite the Legislature's expressed intent to make it broader.  The RJA's inclusion of the words "similarly situated" does not compel such an incongruous interpretation, because an alternative interpretation is readily available:  Statistical techniques such as regression analysis can show that racial disparities exist even when one controls for various relevant characteristics, meaning that racial disparities exist among defendants who are similarly situated (i.e., defendants who share those relevant characteristics).  The statute's reference to defendants who are "similarly situated" thus does not mean that a defendant

7

must prove, at the prima facie stage, that there is at least one other defendant who is *identical* except for race and has an *identical* case except for race but who was treated less harshly. Moreover, the effect of the trial court's interpretation would be to put the burden on the defendant, at the prima facie stage, to negate every possible race-neutral reason for the racial disparities shown by the statistical evidence. That conflicts with the statutory language, which puts the burden on the prosecution to "establish race-neutral reasons for the disparity." (§ 745, subd. (h)(1).)

For all of the foregoing reasons, I conclude that the trial court erred by ruling that more than statistical evidence is required to make a prima facie case under the RJA. Moreover, the district attorney does not otherwise challenge the sufficiency of Austin's statistical evidence, and the evidence is clearly sufficient to make a prima facie case. Austin's statistical evidence appears to be at least as strong as the statistical evidence at issue in *McCleskey*, and given that statistical evidence can be sufficient to make a prima facie case, I see no basis to conclude that Austin's evidence fails to show more than a mere possibility of proving a violation of section 745, subdivision (a).

Finally, there is an aspect of the People's argument that I believe should be briefly addressed. In their return to Austin's writ petition, the People claim that Austin is "accus[ing] the District Attorney of racism." The People made the same claim in the trial court: "And let's be very clear. The defense here is calling all of us racist." The People do not elaborate or attempt to defend the claim, and I believe that the claim is mistaken. Austin is bringing a claim under the RJA. Such a claim does not require proof of "intentional discrimination." (§ 745, subd. (c)(2).) Moreover, the RJA was expressly

8

intended to provide remedies for harms caused by implicit bias, which is "often unintentional and unconscious" (Assem. Bill 2542 (2019-2020 Reg. Sess.) § 2, subd. (i)), and "[t]he Legislature has acknowledged that all persons possess implicit biases" (*id*., subd. (g)). Nothing in the legislative findings or elsewhere in the RJA suggests that the Legislature was accusing all persons of racism. Austin's motion for relief under the RJA is similar. He contends that he has introduced sufficient evidence to make a prima facie case under that statute. The statute does not require—either for a prima facie case or to prevail at a subsequent hearing—that Austin allege or prove that the prosecutors are racist, and nothing in the record suggests that he is attempting to do so.

The trial court erred by concluding that statistical evidence cannot be sufficient to make a prima facie case under the RJA. Austin's statistical evidence was sufficient. I therefore concur in the judgment granting the petition and directing the trial court to conduct a hearing under subdivision (c) of section 745.

MENETREZ

J.

9